**SUNSET ENTERPRISES, INC.,**
Appellant,

v.

**B & B COAL COMPANY, INC. et
al, Appellees.**

Civ. A. No. 83–0257–B.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Feb. 6, 1984.

Fred Leonard, Bristol, Va., for appellant.

Hugh P. Cline, Norton, Va., for appellees.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The appellant, Sunset Enterprises, Inc., appeals from a decision of the United States Bankruptcy Court for the Western District of Virginia determining the extent of a lien in this Chapter 11 case. The Bankruptcy Judge held that the agreement between Sunset Enterprises and B & B Coal Company was a "pure" lease rather than a lease for security. By an Order dated July 14, 1983, the Bankruptcy Court directed that Sunset Enterprises file an acceptance of the lease pursuant to 11 U.S.C. § 365 with provisions for cures and adequate assurances before July 25, 1983; failure to accept is deemed a rejection. Four issues are presented to this court on appeal: (1) whether the court shall apply the clearly erroneous standard to the factual findings of the Bankruptcy Court; (2) whether the agreement is a lease intended as a security interest under Va.Code § 8.1–201(37); (3) whether the defendants' withholding of monies for unsecured accounts receivable and for lease payments constitutes a preference under 11 U.S.C. § 547; (4) whether the defendants' withholding of monies after the filing of the petition is an unauthorized postpetition transfer under 11 U.S.C. § 549(a)(2)(B). Jurisdiction over this appeal is premised upon 28 U.S.C. § 1334. For the reasons given below, the court affirms the decision of the Bankruptcy Court and remands the case for further determination of whether the withheld funds as payments on the advances constitute a preference under 11 U.S.C. § 547.

## I. FACTS

On March 2, 1981, B & B Coal Company and Sunset Enterprises entered into a three-year written agreement (Exhibit A) whereby B & B Coal leased to Sunset certain deep-mine rights and equipment to mine coal as an independent contractor at the number six and number nine mines in Dickenson County, Virginia. The parties agreed that the fair market value of the equipment was $1,400,000 and that the minimum rental payments per month were $49,500.[1] The agreement also gave Sunset Enterprises an option at any time during the existence of the contract to purchase the equipment leased to them with the rental payments credited toward the agreed price of $1,400,000.[2] Under paragraph XIII, the lessee posted a security of $140,000 for the agreement which would cease at the end of one year. Sunset Enterprises

---

1. According to the testimony of Curtis Large, president of Sunset Enterprises, the figure of $49,500 was computed by multiplying the price for a clean ton of coal ($2.75) by the number of tons of clean coal the appellant could mine per month when both numbers six and nine mines were operating (18,000 tons). At the expiration of the thirty-six month period, the account would be reduced to zero. (Tr. 10–12, 81, 96)

2. Paragraph IV of the agreement entered March 2, 1981 provides:

   The Lessor agrees that under this rental lease agreement that [sic] the Lessee shall have the option at any time from the date of this agreement during its duration for a period of three years from date to purchase the equipment listed in Exhibit A and all rental payments paid at the time of the exercise of the option shall be credited toward the agreed purchase price of One Million Four Hundred Thousand Dollars ($1,400,000), with the exception that the monthly rental payments shall be applied first to interest at the rate of fourteen percent (14%) on the unpaid balance and after deduction of the interest, the principal paid on the purchase price shall be given full credit toward the purchase price.

furnished no additional monetary consideration. (Tr. 64) The parties also agreed in paragraph VI that Sunset Enterprises would be responsible for all expenses related to the operation of the mines, and Mr. Large testified that his company paid the maintenance, tax and insurance expenses. (Tr. 25) Almost immediately on March 2, 1981, the parties joined into an addendum (Rec. at 33) that until the number nine mine was operational, the minimum tonnage was 10,000 tons of clean coal per month at a rate of $2.75 per ton or a minimum rental payment of $27,500 a month. Subsequently, several pieces of machinery were added, and the fair market value was amended to $1,463,500. (Plaintiff's Exhibit 4) Ultimately, the parties agreed that the rental payments for the machinery were not due unless Sunset Enterprises mined coal. (Tr. 52, 59–60, 73, 93–94, 96; Appellant's Brief at 3).

On May 27, 1982, Sunset Enterprises filed a petition in bankruptcy to reorganize under Chapter 11. The Bankruptcy Judge entered an Order on June 2, 1982 authorizing the debtor-in-possession to retain possession and manage its property. 11 U.S.C. § 1108. Sunset Enterprises filed an adversary proceeding to determine the extent of the lien and recover the prepetition and postpetition monies withheld.

At the hearing held by the Bankruptcy Court on July 13, 1983, Curtis Large, president of Sunset Enterprises, testified that his company was incorporated "for the sole purpose of buying that equipment." (Tr. 8) The capital to operate the infant company came from loans from B & B Coal Company and Ambrose Branch Coal Company. (Tr. 68, 78) Although Mr. Large stated that Mr. Bolling was not helping them commence contract mining, he did agree that Mr. Bolling advanced the company the money to begin (Tr. 53) and purchased their mined coal. (Tr. 45) On August 7, 1981, Sunset Enterprises borrowed from Jack Bolling or B & B Coal $60,000 at a rate of 14% interest and an additional $50,000 at a rate of 15% interest on December 15, 1981. (Plaintiff's Exhibit 2; Tr. 18–19, 56, 81) The appellees carried these advances on their books as accounts receivable. When Ambrose Branch Coal purchased the coal which Sunset Enterprises mined from March 2, 1981 until April 30, 1982, the appellees withheld monies from the proceeds for rental on the equipment, payment of the advances, and royalties. (Rec. at 37–38; Tr. 15–16) The amount of $68,-023.59 for rental payments was withheld in the ninety-day period prior to bankruptcy and $51,467.77 for the period after the petition was filed. (Plaintiff's Exhibit 3) The total amount of $24,169.76 for the two loans also was withheld within ninety days of the filing of the petition. (Plaintiff's Exhibit 2)

At the hearing before the Bankruptcy Judge, Mr. Bolling characterized Sunset Enterprises as a contract miner (Tr. 91); their only obligation under the lease was to mine coal. (Tr. 68) Mr. Bolling did not intend the agreement to be a sale. There were no security agreements between the two companies on the equipment (Tr. 94), although Dominion Leasing Corporation and First and Merchants National Bank have filed financing statements on the equipment. (Plaintiff's Exhibit 1A) Sunset Enterprises did not receive a sublease of the mineral rights. (Tr. 57–58, 91, 97) Title to the machinery did not pass to Sunset Enterprises. (Tr. 43) Furthermore, the appellant did not take off the depreciation of the machinery on their federal income tax (Tr. 59), whereas B & B Coal and Ambrose Branch maintained the equipment on their books and depreciated it for tax purposes. (Tr. 67–68, 73) Payments from the appellant were documented as rental income, and B & B Coal and Ambrose Branch paid federal income tax on the rental payments. (Tr. 95–96) Even though the lease contains an option-to-purchase provision, the appellant has not exercised the option.

II.

The first issue which the appellant raises is whether this court should apply the clearly erroneous standard to the factual

findings of the Bankruptcy Court. The notice of appeal was filed July 10, 1983. On August 1, 1983, during the pendency of this appeal, the new bankruptcy rules became effective. In the Order dated April 25, 1983, adopting the bankruptcy rules, the Supreme Court ordered that the new rules "shall be applicable to proceedings then pending" except to the extent that the application of the new rules are not feasible or would work an injustice. Bankruptcy Rule 8013 provides in pertinent part that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."[3] The appellant argues that the emergency bankruptcy rule adopted in the Western District of Virginia on December 24, 1982 in response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), requires the court to conduct a *de novo* review of the facts. Rule (e)(2)(B) states that "the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge."

■ The Third Circuit has addressed this issue in the recent case of *Frank v. Arnold (In re Morrissey)*, 717 F.2d 100 (3d Cir. 1983). The appellate court held that "this conflict must be resolved in favor of the clearly erroneous standard announced in the new bankruptcy rules." *Id.* at 104. The court reasoned that the national rules, adopted under the authority of 28 U.S.C. § 2075, allow each district court to adopt local rules of procedure that are not inconsistent with the national rules. Bankruptcy Rule 9029. Consequently, local courts have no authority to enact local bankruptcy rules which collide with Bankruptcy Rule

8013. The court concluded that "subsequent to August 1, 1983, any local rule governing *procedure*, as distinguished from *jurisdiction*, in bankruptcy cases must yield to the bankruptcy rules duly promulgated under the Supreme Court's statutory authority. 28 U.S.C. § 2075." *Id.* at 105. This court finds the reasoning and decision of the Third Circuit Court of Appeals persuasive and concludes that the clearly erroneous standard is the appropriate criterion. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Acacia Mutual Life Insurance Co. v. Perimeter Park Investment Associates, Inc.*, 616 F.2d 150, 151 (5th Cir.1980). Concluding that the Bankruptcy Judge has not committed a mistake, this court determines that the factual findings are not clearly erroneous.

### III.

■ The second issue is whether the agreement is a lease intended as a security interest under Va.Code § 8.1–201(37) (Vol. 2A & Supp.1983). The pertinent part of the section provides:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation .... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nomi-

---

**3.** Bankruptcy Rule 8013 reiterates the same standard as Rule 810 of the Rules of Bankruptcy Procedure. Rule 810 provides that "[t]he court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses." Since the standard is the same, applying the new rule is feasible and does not create an injustice.

nal consideration does make the lease one intended for security.

"[T]he findings of the [Bankruptcy Judge] on questions of intent ... are questions of fact, or in some instances, mixed questions of law and of fact." Unless the Bankruptcy Judge has made a clear mistake applying the law to the facts, the factual findings of intent must be affirmed. *Rish Equipment Co. v. Joe Necessary & Son, Inc. (In re Joe Necessary & Son, Inc.)*, 475 F.Supp. 610, 614 (W.D.Va.1979), quoting *Tepper v. Chichester*, 285 F.2d 309, 312 (9th Cir.1960). *See* 4A J. Moore & R. Ogleboy, *Collier on Bankruptcy* § 70.39 n. 38 (14th ed. 1978). The courts have examined several factors when determining whether a lease is intended as a security interest:

(1) whether there was an option to purchase for a nominal sum, (2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment, (3) whether the nature of the lessor's business was to act as a financing agency, (4) whether the lessee paid a sales tax incident to acquisition of the equipment, (5) whether the lessee paid all other taxes incident to ownership of the equipment, (6) whether the lessee was responsible for comprehensive insurance on the equipment, (7) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense, (8) whether the agreement placed the entire risk of loss upon the lessee, (9) whether the agreement included a clause permitting the lessor to accelerate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgage, (10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor for this specific lessee, (11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment, (12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement, (13) whether there was a default provision in the lease

inordinately favorable to the lessor, (14) whether there was a provision in the lease for liquidated damages, (15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor, (16) whether the aggregate rentals approximate the value or purchase price of the equipment.

*K.L.C. v. Brookside Drug Store, Inc. (Matter of Brookside Drug Store, Inc.)*, 3 B.R. 120, 122–123 (Bkrtcy.D.Conn.1980) (citations omitted). *See Matter of Marhoefer Packing Co.*, 674 F.2d 1139, 1145 (7th Cir. 1982); *Steele v. Gebetsberger (Matter of Fashion Optical, Ltd.)*, 653 F.2d 1385, 1389 (10th Cir.1981) (using the factors from J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 22–3 at 882–83 (2d ed. 1980)). *See generally* Annot., 76 A.L.R.3d 11 (1977 & Supp.1983).

Judge Pearson found that the clear intent of the parties was to enter a "pure" lease. He based his conclusion on two premises: The defendants treated the agreement as a lease for tax and other purposes, and the debtor entered the lease to obtain profits from the mining without investing any capital (Rec. at 52).

The original agreement entered into on March 2, 1981 has an option-to-purchase clause with an agreed price of $1,400,000 if Sunset Enterprises exercises the option. This sum is equal to the fair market value of the equipment at the time of leasing. Under the agreement, the lessee is responsible for the maintenance costs and insurance premiums, and the company pays a security deposit equal to ten percent of the agreed value of the equipment. The lessor warrants that the equipment was "in good merchantable condition and in good working order." Upon default, the agreement terminates, and the lessor takes possession of the equipment and mines. The subsequent addendum reduced the monthly payments. The evidence *ore tenus* showed that the lessor is financing the young corporation and treats the agreement as a lease. No financing statement evincing an interest of Sunset Enterprises in the ma-

chinery was filed. The strongest indication that this agreement is a lease is the understanding of the parties that the "rental" payments are due only if Sunset Enterprises mines coal.

> In order to find that a lease is intended as security, it is necessary to find an obligation on the part of the lessee that is to be secured. A definite obligation to pay rentals during the lease term totalling an amount substantially equivalent to the fair market value of the leased property plus a financing factor as viewed at the time the property is transferred to the lessee, is a precondition to finding that the lease is intended as security. Conversely an agreement that gives the lessee the right to terminate the lease at any time during the lease term, without any obligation for rents accruing during the remainder of the lease term, should undoubtedly be viewed as a true lease.

*In re Peacock*, 6 B.R. 922, 924 (Bkrtcy.N.D. Tex.1980).

■ While there are some factors which support a finding that the lease was intended as security, other factors reveal that the parties intended the contract to be a lease. The Bankruptcy Court did not make a clear mistake in applying the law to these facts. Thus, the court affirms the decision of the Bankruptcy Judge that this agreement is a pure lease.

### IV.

■ The third issue is whether the defendants' withholding of funds for payment on unsecured accounts receivable and the lease constitutes a preference. In order for the trustee to avoid these involuntary payments, six requirements must be met: (1) transfer of the debtor's property,[4] (2) to or for the benefit of the creditor, (3) for or on account of an antecedent debt, (4) debtor is insolvent, (5) made within ninety days of the filing of the petition, or within one year if the creditor is an insider and has reasonable knowledge that the debtor was insolvent, and (6) the transfer enables the creditor to receive more than he would under Chapter 7. 11 U.S.C. § 547(b). If one requirement is not present, then the transfer is not preferential.

The lease agreement of March 2, 1981 covered the equipment, but it does not mention the agreement concerning the advances made on August 7, 1981 and December 15, 1981. Thus, these two agreements are separate, distinct contracts.

"[T]he mere exchange of property of equal value within ninety days preceding bankruptcy does not constitute a preference." 4 Collier on Bankruptcy § 547.20 at 547–71.

> Preference implies paying or securing a pre-existing debt of a person preferred. *Dean v. Davis*, 242 U.S. 438 [37 S.Ct. 130, 61 L.Ed. 419] (1917). Where one gives an insolvent person value for a transfer of property, where he makes an exchange of property, there is no preference. *Ernst v. Bank*, 201 F. 664 (2d Cir.1912).

*In re Perpall*, 271 F. 466, 468 (2d Cir.1921).

■ Addressing the lease first, the court notes that under the contract, the parties agreed to collect and pay the rent for equipment only if the coal was mined. Since the debt was conditioned upon mining coal in the number six mine, there is no antecedent debt. Moreover, the appellant admits that a finding that the lease is a "pure" lease renders the question of rental preference moot. (Appellant's Brief at 7)

■ However, the preferential treatment of the advances is different. It appears that Sunset Enterprises owed a monthly payment under the terms of the loans. The debt arose once the debtor borrowed the money. Thus, the debt is antecedent. During the ninety days prior to

---

**4.** Under § 547 the trustee may avoid both voluntary and involuntary transfers. § 101(40) defines a "transfer" to mean "every mode ... voluntary or involuntary, of disposing of ... property." *See* 4 L. King, Collier on Bankruptcy § 547.10 at 547–37 (15 ed. 1979 & Supp.1983). The involuntary withholding of the debtor's money owed to the creditor could be a transfer of the debtor's property.

filing a petition in bankruptcy, the appellees retained funds that the debtor received for the sale of his coal. These transfers benefited the appellees and may have enabled them to receive more than they would have if the debtor liquidated his estate. Under the Bankruptcy Code, the debtor is presumed to be insolvent on and during the ninety days before filing a petition in bankruptcy. 11 U.S.C. § 547(f). Accordingly, withholding funds for payment of the advances appears to be a preferential transfer. Since the Bankruptcy Judge failed to consider whether payment of these loans were preferences, this issue is remanded for a further determination.

## V.

The final issue is whether the defendants' withholding of monies in payment for the equipment rent is an authorized postpetition transfer. The trustee may avoid a transfer of the property of the estate that happens after the case is commenced and that is not authorized by the court. 11 U.S.C. § 549(a). It is undisputed that transfers occurred after the petition was filed. By an Order dated June 10, 1982, the Bankruptcy Court authorized the debtor to retain possession and manage its property. *See* 11 U.S.C. § 1108. A debtor-in-possession has the same rights and powers of a trustee and shall perform most functions of a trustee. 11 U.S.C. § 1107. One power which the debtor has is the authorization to enter into transactions in the ordinary course of business. Such transactions include sale of property of the estate. 11 U.S.C. § 363(c). Since the terms of the agreement conditioned the equipment rental payments upon mining coal, the payments became due in the ordinary course of mining coal. Furthermore, the appellant admits this issue is moot once the court affirmed that the agreement was a lease. (Appellant's Brief at 7) Thus, these payments under the lease were not unauthorized postpetition transfers.